**Tallulah MORGAN, et al.,
Plaintiffs, Appellees,**

v.

**Daniel R. BURKE, et al.,
Defendants, Appellees.**

**Boston Teachers Union Local
66, Appellant.**

**No. 90–1614.**

United States Court of Appeals,
First Circuit.

Heard Dec. 3, 1990.
Decided Feb. 21, 1991.

Matthew E. Dwyer with whom Grady and Dwyer, was on brief, Boston, Mass., for appellant.

Robert Pressman with whom Thomas I. Atkins, was on brief, Cambridge, Mass., for plaintiffs, appellees.

Henry C. Dinger with whom Marshall Simonds, Deborah J. Gresco, and Goodwin, Procter & Hoar, were on brief, Boston, Mass., for defendants, appellees.

Caroline B. Playter with whom Kenneth Kimerling, Nat. Lawyers Guild, Kehoe, Doyle, Playter & Novick, and Puerto Rican Legal Defense Fund, Inc., were on brief, Boston, Mass., for El Comite de Padres.

Jody L. Newman with whom Nancy Gertner, and Dwyer, Collora & Gertner, were on brief, Boston, Mass., for Concerned Black Educators of Boston.

Robert H. Blumenthal, Sp. Asst. Atty. Gen., with whom Carmen I. Rodriguez, Asst. Atty. Gen., was on brief, Quincy, Mass., for Com. of Mass.

Before BREYER, Chief Judge, ALDRICH and COFFIN, Senior Circuit Judges.

COFFIN, Senior Circuit Judge.

After nearly two decades of litigation aimed at desegregating the Boston public school system, this appeal by Boston Teachers Union Local 66 (BTU) challenges certain features of a "Final Judgment" entered by the district court on May 31, 1990.

The challenges are confined to the area of faculty and staff desegregation and present three issues: (1) whether, despite some shortfalls from earlier established goals, unitary status has been achieved in the hiring of faculty and administrative staff; (2) whether the court's prescription for determining the end of judicial involvement in faculty and staff hiring and layoffs "constitutes an impermissible permanent order;" and (3) whether, even if overall unitary status has not been achieved for faculty and staff, the court should have declared that partial unitariness had been achieved insofar as "other minority" (non-black) faculty and staff are concerned.

We affirm the Final Judgment, as amended by the deletion of two words which unnecessarily inject uncertainty in an otherwise definite and limited decree and which the parties at oral argument agreed did not accord with their understanding.

## Unitariness

The starting point in dealing with the first issue, whether or not unitariness has been achieved in faculty/staff hiring, is *Morgan v. Nucci*, 831 F.2d 313 (1st Cir. 1987). In that case, BTU appealed on the same issue it raises here: whether the goals of 25 percent black and 10 percent other minority faculty and staff, which were established in the mid–70s and were not yet fully realized, were no longer within the court's jurisdiction because unitariness had been achieved.

We began our analysis in *Nucci* by rehearsing the history of discriminatory hiring and segregationist assignment policies which had isolated black students, teachers, and administrators in a limited number of schools. *Id.* at 327. We then summarized the lengthy history of orders relating to faculty hiring dating from 1975: an initial requirement to hire one black for every white teacher until 20 percent of faculty was black and to pursue an active recruiting program until a goal of 25 percent black faculty was reached; a 1976 order extending the same goals for black administrators; a 1978 order requiring that black faculty increase by at least 1½ percent a year until the 20 percent goal was reached; a 1981 order suspending the affirmative

recruitment obligation during a budget crisis but requiring that layoffs preserve existing racial ratios; a 1985 order allowing tenured teachers to be recalled without regard to race; and a 1985 "final" order establishing faculty/staff goals of 25 percent black and 10 percent other minorities with required minimum annual rates of increase of ½ percent and ¼ percent, respectively. *Id.* at 327–28.

We responded to BTU's argument that the implementation of racially neutral personnel practices was "tantamount to unitariness" within the teaching of *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 96 S.Ct. 2697, 49 L.Ed.2d 599 (1976) by saying:

> [I]t is well established that a desegregation court is allowed—indeed required—to combat not only existing racial partisanship but also the lingering effects of past discrimination. Thus, the fact that a particular school policy or program may be 'racially neutral,' in that it no longer reflects discriminatory animus, does not prove that the effects of prior discrimination have been purged.
>
> .    .    .    .    .
>
> Here, ... the makeup of the schools' faculty remains nonunitary judged by the standards established virtually at the inception of the desegregation process. And the record does not suggest these goals have become infeasible, a negative inference buttressed by the failure of the school defendants—who, after all, must execute the hiring orders—to appeal from this aspect of the final orders. Absent the attainment of 'maximum practicable desegregation' in a particular educational area, a district court has every right to require continued compliance with its outstanding orders.

831 F.2d at 328–29 (citations omitted). *See also Bd. of Educ. v. Dowell,* — U.S. —, 111 S.Ct. 630, 638, 112 L.Ed.2d 715 (U.S. 1991) (court must determine whether vestiges of past discrimination have been eliminated to the extent possible by looking to all facets of school operations).

■ This is the law of this case. BTU recognizes this fact but asserts that progress during the past five years, the good faith of public officials, and the present degree of compliance warrant a different result. But BTU bears a heavy burden. The determination that a school system has or has not reached a point of "maximum practicable desegregation" in the composition of its faculty and staff is a fact-intensive one. Findings are reversible only if clearly erroneous. *See, e.g., Keyes v. School Dist. No. 1,* 895 F.2d 659, 666 (10th Cir.1990). Moreover, the discretion accorded to a judge who has lived with the case since its inception must be ample. We would not lightly find abuse of such discretion. *See Swann v. Charlotte–Mecklenburg Bd. of Educ.,* 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971) ("In this area, we must of necessity rely to a large extent ... on the informed judgment of the district courts in the first instance....").

■ What are the essential facts? BTU understandably submits evidence of impressive progress: between 1986 and 1990, blacks and other minorities accounted for 53.49 percent of new hires and 72 percent of newly appointed permanent teachers; they account for 40 percent of all principals and headmasters and 37.28 percent of all other administrators; the School Committee has implemented a voluntary affirmative action plan, with, according to BTU, "no evidence that the BTU is unwilling or unable to negotiate over that item." On the other hand, there are shortfalls that we cannot say are insignificant. While the "other minorities" faculty goal of 10 percent was met as of March 15, 1990, the percentage of blacks was 23.84, 1.16 percentage points below the goal; while black administrators had met the 25 percent goal for both Category I and II administrators, "other minorities" had met the 10 percent goal for Category II, but not for the more important Category I (principals and headmasters); and while blacks now constitute more than 25 percent of the faculty at one of the three examination schools, the Boston Latin Academy, neither blacks nor other minorities have met the five other percentage goals set for those schools.

The district court arrived at its final judgment in four steps. It first asked for written submissions commenting on a very simple draft final judgment which would have permanently enjoined defendants from racial discrimination and required the maintenance of the Department of Implementation. It then held a hearing to receive oral presentations. Finally, it issued its own "final Judgment" and an accompanying explanatory memorandum.

The court first announced at the oral hearing that the black and other minorities goals were not "picked out of the air" but that the court and the parties had "found that black and other minority faculty were available to the extent of the percentages set." It then stated:

The Court finds explicitly that there has not been a unitary system achieved in ... the Boston Public Schools. Before they are unitary in the sense ... that vestiges of past discrimination have been eliminated, a great deal remains to be done.

In its written memorandum accompanying final judgment, it added that "experience shows that complete compliance ... is within reach."

We look in vain for any indication that the court committed clear error. Defendants had met the court's yearly percentage increase goals for black faculty in four of the five years between 1984–85 and 1989–90. The default in one year was attributable to the School Board's misreading of the court's requirement. BTU points to a number of articles in educational journals attesting to impending shortages of minority teachers and a memorandum from the Boston Schools Senior Personnel Manager acknowledging this fact. But a reading of the former reveals no statistics for Massachusetts or the New York–New England area and the observation of the Senior Personnel Manager was made in the context of his request for waivers of certification which would facilitate defendants' efforts to comply with the court's requirements. Additionally, the School Defendants seek affirmance of the judgment and "dispute the union's contention that achievement of the remedial goals of staff desegregation are no longer attainable."

Indeed, BTU does not seem to argue that the court wrongly rejected its argument that literal compliance was infeasible. It seems to rest on the proposition that "almost" is as good as "complete." Such a proposition does not replace the customary burden to show that changed circumstances compel a finding of unitariness. In this regard, BTU suggests that a 1.16 percent variance from the goal of 25 percent black faculty and staff employment is a difference of no significance. But even were this the only statistic that did not meet the earlier-established benchmarks, the suggestion is at odds with a basic understanding of the order requiring that the percentage of black employment rise by at least .5 percent per year. Under that order, the school district would not be required fully to reach the 25 percent goal for another three years. In light of this, the court clearly was not wrong in finding the shortfall to be significant.

We therefore find no error in the district court's conclusion that unitariness had not yet been achieved.

### Perpetuity of the Order

In discussing BTU's challenges to the order on the ground that it is impermissibly perpetual, we think clarity will be served if we trace its development, noting the problem it was designed to deal with, how it dealt with that problem, and how it was interpreted, before assessing the contentions.

As we have noted, the draft final judgment circulated by the court for comment was basically a stark permanent injunction. Both the written submissions of the parties and their oral presentations revealed a deep concern that the state of compliance was fragile, that over the years, because of the disincentives and obstacles depressing minority recruitment, the seniority system had become one dramatically favoring white teachers and staff, and that any substantial layoff of faculty in order of reverse seniority, as provided for in the collective bargaining agreements, would undo

in a day what had taken years to accomplish.

Data were furnished the court showing the paucity of black and other minority faculty and staff possessing seniority dates preceding 1974 and 1977 and an indication of the impact of any seniority-controlled layoff. In preparation for a possible layoff of 450 teachers, a pool of 769 was identified: 45.5% were blacks although they constituted only 23.84% of total faculty; 41.2% were whites although they constituted 66.05% of the total; and 13.3% were other minorities although they constituted 10.11% of the total.

Several suggestions were made to deal with the problem of "skewing" threatened by the fact, as recognized by the court, that "seniority is not a racially neutral criterion in the Boston Public Schools." One suggestion was to require continuing adherence to the 25 percent ratio. Both the plaintiffs and the State Board recommended that the final judgment require maintenance of the goals for a period of three years. By the end of the oral hearing the court obviously had reached a decision in principle. It first stated:

> Will the Court's order have an indefinite duration? No. The Court may not make orders of indefinite duration in these cases. They may make orders only that are operative until the vestiges of the discrimination that was unlawful have been removed. And in this instance there is in ... the facts that are relevant here a termination point that is obtainable and will be adopted by the court.

It then articulated the concept that its order would terminate when minority faculty would have attained such seniority that layoffs of minority faculty would reflect their proportionate numbers in the system.[1]

In the Final Judgment, the court fixed the size of layoff to be used in determining that seniority "skewing" had been sufficiently corrected. It thereby gave definiteness to the remedy and precluded the assumption that a massive layoff could indefinitely extend the life of the order. The court ordered that defendants

> (3) shall achieve and maintain a desegregated faculty and administrative staff ... and a desegregated faculty at each of the three examination schools, comprised of not less than 25% blacks and 10% other minorities ... and, notwithstanding applicable collective bargaining agreements, shall conduct any reduction in force (RIF) of either faculty or staff in such a manner as to preserve after such RIF substantially the same racial/ethnic proportions of faculty and staff as existed immediately before it; provided that the orders in this paragraph shall expire when black and other minority faculty and staff shall have attained seniority to such an extent that, were a RIF to occur based upon the seniority provisions of applicable collective bargaining agreements reducing faculty and staff by 3% or more, the racial/ethnic proportions of faculty and staff after such a RIF would, in the written opinion of the Superintendent of Schools, be substantially the same as those existing before it.

In its attached memorandum, the court found that such a means was narrowly tailored to achieve important remedial governmental objectives. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 280, 106 S.Ct. 1842, 1850, 90 L.Ed.2d 260 (1986) (plurality opinion) (some heightened scrutiny appropriate for reviewing any race conscious governmental action). *See also City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989).

■ BTU's challenge first repeats an argument that it made to the 1985 order, that the words at the inception of the paragraph, "achieve and maintain," mandate perpetual governance. But we say now as we said in *Nucci*, "[o]nce these goals [e.g.,

---

1. The court added, by way of illustration: "To repeat, I will try to state this with precision in my written order. Let's assume three hundred layoffs. Let's assume for this purpose 24 percent black, 10 percent other minority faculty. When layoffs result in a laying off of white faculty to the extent of 65 percent of the layoffs, black to the extent of 25 percent, 24, and Hispanics to the extent of 10, then the Court's order with reference to desegregation of faculty and staff will expire by its own terms.

25 percent black faculty ratio] have been adequately reached, the district court's role in the school's personnel policies will end...." 831 F.2d at 329. No "fixed, permanent percentages" have been established by these words.

■ The words "adequately reached" are the target of BTU's second argument. By its order, the district court effectively has declared that the long-established goals will have been adequately reached when a Superintendent of Schools can certify that the system is in such shape that, were a 3 percent RIF to take place (i.e., as of the spring of 1990, a layoff of 153 faculty and staff out of a total 5102), and reverse seniority applied in accordance with collective bargaining agreements, there would be no resultant substantial change in racial composition. The district court estimated, from the tenure statistics, that this point would be reached at about the same time as completion of implementation of the United Facilities Plan.

BTU, on the other hand, argues that the goals are adequately reached, if not now, then in that magic moment when the ratio goals are satisfied for the first time. In that moment, it suggests, the court immediately should lose its power to continue remedial orders and defendants should be free to follow practices that will increase racial imbalance. It argues that race-based layoffs as described in part three of the final order are therefore inappropriate.[2]

BTU thus would have us rate achievement of the 25 percent goal as judges at a track meet of a pole vault or high jump event: how high one goes, not how long one stays, is the sole criterion. If there were not some discretion lodged in a desegregation court to attempt in a modest and limited way to assure that the attainment of long sought for goals was not illusory and ephemeral, the entire exercise, into which so many had invested so much, could well prove to have been a painful charade.

This kind of limited monitoring has been recognized as necessary in the two circuits that have had perhaps the most comprehensive and intensive experience in desegregation litigation. In both the Fifth and Eleventh Circuits, courts have followed the practice of retaining jurisdiction for a three year period after technical compliance with orders has been reached. *Quarles v. Oxford Mun. Separate School Dist.*, 868 F.2d 750, 752 (5th Cir.1989); *Ross v. Houston Indep. School Dist.*, 699 F.2d 218, 227 (5th Cir.1983); *Pitts v. Freeman*, 887 F.2d 1438, 1446 n. 9 (11th Cir.1989).

Moreover, BTU's argument would transform "law of the case" into a trap or straitjacket for a court if it could not interpret prior general concepts in the light of later events. In this case, for example, the concept of "adequately reaching" a goal seems to us to require the sort of further definition that we find in paragraph (3) of the Final Judgment. Such a provision gives specificity to what was an abstraction; it does not "reopen [a] point[ ] of law already decided." *White v. Higgins,* 116 F.2d 312, 317 (1st Cir.1940) ("The doctrine of 'law of the case' is not an inexorable command. It 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit to their power.'" (Citations omitted.) (Magruder, C.J.)). *See also Cornelius v. Hogan,* 663 F.2d 330, 334 n. 6 (1st Cir.1981). The court's fine tuning of when percentage goals have been "adequately" achieved to include their ability to withstand a RIF of 3 percent was restrained; it did not push into the remote future the reasonable possibility of meeting the "built-in terminus" as now defined.

We do, however, feel compelled to make one change in the Final Judgment as written. The point of termination of the order was defined as being that when a RIF of "3% or more" could follow reverse seniority without changing racial balance. We see no constructive purpose served by the

---

**2.** We note that BTU does not challenge the district court's remedial power to override seniority *per se. See Wygant,* 476 U.S. 267, 106 S.Ct. 1842 (raising some question of the appropriateness of race-based layoffs to address any gov-

ernmental interest). *See also Morgan v. O'Bryant,* 671 F.2d 23 (1st Cir.1982) (affirming at an earlier stage in this case the imposition of seniority override layoffs, vigorously challenged at that time by BTU).

"or more" language, and the parties at oral argument were unable to help us. The words obviously introduce uncertainty and open-endedness into an otherwise precise concept. We also think that they contravene the intent of the court expressed at the oral hearing. They therefore will be excised.

BTU makes one final argument against Paragraph (3) of a highly technical nature. It argues, so far as we can understand it, that teachers are assigned to many program areas and that restrictions applying to various areas make it impossible to ascertain when a seniority layoff will preserve existing percentages. We merely observe that since 1981 layoffs have been accomplished in such a way as to preserve existing percentages, that presumably predicting the effect of a 3% layoff would pose no greater challenge, and that the School Defendants, who must be relied upon to implement the order, have raised no objection.

### Other Minority Faculty

■ As we have recognized, the 10 percent goal for other minority faculty (but not administrative staff) was reached in March of 1990. BTU argues that other minority faculty now be removed from any protection afforded by the court's order. This argument requires the assumption that progress in desegregation can be fragmented in very small parts. We have of course acknowledged in *Nucci* that the area of student assignments is a discrete sector and that the achievement of unitariness in that sector can be judged independently of progress or lack thereof in other sectors. 831 F.2d at 318–19. But we would not think of further subdividing that area into assignments to particular schools. By the same token we resist the invitation to subdivide faculty and staff into blacks and other minority, or faculty and staff outside of and within examination schools.

In *Nucci* we referred to the applicability of the *Spangler* doctrine of selective unitariness "where unitariness has been achieved, as to either the entire school system or a wholly separable subset thereof."

831 F.2d at 319 n. 5. We cannot look on "other minority faculty" as a "wholly separable subset." To do so would open the door to substantial regression in the employment of other minority teachers at the very time when court-ordered increases in black faculty are continuing. Indeed the latter might well be taking place at the expense of other minority faculty. We therefore conclude that the relevant separable subset at issue here is the universe of faculty and staff desegregation orders, and we decline to dissect further this "facet of school operations." *Dowell*, 111 S.Ct. at 638.

### Conclusion

We therefore amend part (3) of the Final Judgment providing for faculty and staff desegregation by deleting "or more" after "3%." We affirm the Judgment as amended.