**Julia A. McLAUGHLIN, by Catherine McLAUGHLIN, Plaintiff,**

v.

**BOSTON SCHOOL COMMITTEE, et al., Defendants.**

**Civil Action No. 95–11803–WAG.**

United States District Court,
D. Massachusetts.

Aug. 22, 1996.

Mark A. White, O'Brien, Partlow & White, P.C., Boston, MA, Michael C. McLaughlin, Law Offices of Michael C. McLaughlin, Boston, MA, R. Keith Partlow, O'Brien, Partlow & White, P.C., 50 Congress Street, Boston, MA, for Julia A. McLaughlin.

Henry C. Dinger, John H. Branson, Goodwin, Proctor & Hoar, Boston, MA, for Boston School Committee, Felix D. Arroyo.

## MEMORANDUM AND ORDER FOR PRELIMINARY INJUNCTION

GARRITY, District Judge.

In this case, plaintiff presents an individual equal protection claim challenging an offshoot of a class action, also based upon the Fourteenth Amendment, *Morgan v. Kerrigan,* 509 F.2d 580 (1st Cir.1974) *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975), in which a remedial order entered in 1976 set aside for black and Hispanic students 35% of the seats available at three Boston public schools to which admission is based on a combination of entrance examination scores and sixth grade marks. In 1989, two years after termination of the Court's jurisdiction in the area of student assignments, the defendant Boston School Committee ("BSC") voted to continue the set aside, thereby converting it into a voluntary affirmative action program in favor of the black and Hispanic plaintiff classes in the *Morgan* litigation. Plaintiff claims that the voluntary continuation of the Court order by the BSC resulted in her being denied admission to Boston Latin School ("BLS") in 1995, in violation of her constitutional rights.

Last August, soon after the case was filed, the Court denied plaintiff's motion for a preliminary injunction enjoining defendants [1] from denying her admission as a seventh grader. Now before the Court is a renewal of her motion for a preliminary injunction asking that the defendants be enjoined from denying her admission to BLS as an eighth grader.

### FACTUAL BACKGROUND

To enhance understanding of the parties' contentions and the Court's findings, we allude preliminarily to the uniqueness of BLS, the nature and derivation of the set aside at

---

1. The defendants are the BSC, its members, all appointed by the Mayor, Superintendent Thomas Payzant and two of his predecessors, and Senior Administrator Catherine A. Ellison.

issue, and certain demographic features of the school system of which BLS is a part. In a few instances, we rely on undisputed evidence presented in the *Morgan* litigation over which we presided in the District Court for more than 20 years.

BLS is often referred to generally as one of Boston's high schools. It is much more than that. It is a six-year college preparatory school whose graduates compete with those of nationally-known prep schools such as Exeter, Choate, and Lawrenceville for acceptance at the most prestigious colleges in the country. Established in 1635, it is the oldest public school in the United States, and its graduates include Cotton Mather, Samuel Adams, Charles Sumner and John Hancock. Nowadays, applications for admission always far exceed its 2,415 assignable seat capacity, and several elementary school programs are designed expressly to help pupils excel on the entrance examination.[2] BLS is also distinguished by an official alumni association, established by an act of the Massachusetts legislature 150 years ago, which supports the school and its students in many ways, and joins its faculty and student body in jealously guarding its reputation as the best public secondary school in the City of Boston; its motion for leave to appear as amicus curiae in this case was allowed without opposition last August.

A functional description of the school appears in an affidavit submitted by Michael G. Contompasis, an alumnus, who has been BLS's Headmaster for over 20 years and who previously taught there. In it, he attests that black and Hispanic students who would not have been accepted but for the 35% set aside generally succeed. He continues:

> Boston Latin School may be an elite school, but it is also a *public* school. In my view, it exists not simply to provide a high quality education to many of the most

academically talented children in the city, but also to instill in the future leaders of the city those values and attitudes that are essential to the maintenance of a civil and democratic society.

The physical plant and equipment at BLS are among the finest in the city, due to a complete renovation of the facility five years ago at a cost of $20,000,000. Because the project was represented to the State Board of Education by the BSC as one intended to reduce or eliminate racial imbalance and was tied to funding of the long-range Unified Facilities Plan ("UFP"), a segment of the Court's remedial orders in the desegregation case, 90% of the cost was paid by the State. But for the initiative and support of the black and Hispanic plaintiff classes in the *Morgan* litigation, necessary state funding would not have been available, and BLS would not be what it is today.

Until last year, plaintiff attended St. Mary of the Hills School in Milton, where she achieved a grade-point average of A— for the first two sixth grade marking periods. In November 1994, she took the ISEE, the results of which, in combination with her sixth-grade average, determined her eligibility for admission to one of Boston's three examination schools: BLS, Boston Latin Academy, and John D. O'Bryant School of Mathematics and Science. Plaintiff's first choice was BLS, which two older sisters had previously attended and which had 440 slots available for incoming seventh-grade students. Her ISEE test scores, combined with her sixth-grade point average, gave plaintiff a ranking of 479 among students seeking an examination school assignment.[3] Because of the set aside no student with a ranking below 350 who was not black or Hispanic received an invitation to BLS. Accordingly, plaintiff was not extended an invitation to BLS.

Upon denial of her motion for a preliminary injunction a year ago, plaintiff was as-

---

**2.** Until 1963, admission to BLS did not involve entrance examinations. They were first given in 1963, when a test composed by the school department was used. This practice continued until 1969 when the local tests were replaced by the Secondary School Aptitude Test ("SSAT") which was succeeded within the past year or two by the Independent School Entrance Exam ("ISEE").

**3.** Had BLS simply invited the 440 highest-ranking students who had made it their first choice, plaintiff would have received the next to last invitation, since 41 of the 481 highest-ranking students made an examination school other than BLS his or her first choice.

signed to Boston Latin Academy, which was her second choice and where she recently completed the seventh grade. With the strong support of her parents and in the spirit of the times, she has, by her complaint in this case, challenged the status quo as violative of her constitutional rights.

The set aside originated in the remedial orders entered by the Court in 1975, *Morgan v. Kerrigan*, 401 F.Supp. 216 (D.Mass. 1975), and was explained in an accompanying memorandum of decision, *id.* at 242–45. It applied only to the 1975–76 school year, more as principle than a mechanism, until experience and additional data should warrant modifications. The original order was affirmed by the Court of Appeals in its omnibus ruling on the school desegregation plan. *Morgan v. Kerrigan*, 530 F.2d 401, 423–25 (1st Cir.1976). There, the appellate court discussed whether the set aside was "an impermissible racial quota" and rejected a contention by the Boston Home and School Association "that a racial preference for admission is unconstitutional discrimination on the basis of race," stating: "Whatever the constitutionality of racial preferences in the absence of past unlawful discrimination, they are a basic tool in remedying constitutional violations." *Id.* at 424 n. 35.

Four months later, in paragraph (2) on page 18 of unreported orders dated May 3, 1976, the Court issued a new formula for admission to the examination schools, including the 50th percentile cut-off point for accepting applications. The accompanying memorandum, at 11–15, left no doubt regarding the preferential nature of the set aside, which runs only one way, in favor of blacks and Hispanics. There is no corresponding guarantee for white students.[4] For example,

the memorandum stated: "If more than 35% black and hispanic students rank higher than competing white and other-minority students, they shall of course be admitted, i.e., the goal of 35% is not a ceiling." With minor changes, this formula is still in use. Since September 28, 1987, however, its use has been voluntary by BSC rather than pursuant to court order inasmuch as *Morgan v. Nucci*, 831 F.2d 313, 326 (1st Cir.1987), vacated all outstanding court orders in the area of student assignments.

Because the parties draw conflicting conclusions from the *Nucci* decision, which may have some relevance to the pending motion, we describe its scope and pertinent content. It decided four[5] consolidated appeals, three from District Court orders entered on September 3, 1985 regarding student assignments generally, faculty desegregation, and facilities renovation and construction; and one from an unpublished order entered on May 24, 1985 regarding certain specific student assignments. *Nucci* vacated the injunctive orders addressing the student assignment process on three grounds: (a) the BSC's proven commitment to eliminating racial discrimination; (b) its success in dismantling virtually all the one-race schools the system had once maintained;[6] and (c) its apparently desegregating the schools as much as possible given the realities of modern urban life. No issues having been framed or arguments submitted[7] with respect to the examination schools, the First Circuit's opinion did not mention them except in a passing reference to the impact of their enrollments on the racial ethnic composition of some district middle schools. This relationship between enrollments at the examination and middle schools had been argued below in connection with the unpublished

---

4. For purposes of the 35% set aside and student classification, Asian Americans and Native Americans, who never sought to intervene in the desegregation case, are grouped with whites.

5. To the best of our knowledge, the number of appeals to the First Circuit Court of Appeals from various orders entered in the *Morgan* litigation is 17; and five petitions for certiorari were denied by the Supreme Court.

6. BSC's success in dismantling the examination schools, especially BLS, as identifiably white ob-

viously depended on the operation of the 35% set aside.

7. A review of the briefs filed by all parties to the four appeals discloses only a single reference to the examination schools, two paragraphs in the brief filed by the State Board of Education, suggesting that high attrition rates among black and Hispanic students at the exam schools may have been caused by inadequate delivery of support services and some hostile staff attitudes.

May 24, 1985 order, whose accompanying memorandum rejected a claim by the plaintiff classes that the 35% set aside should be raised to a higher percentage, viz., to the combined percentage of black and Hispanic students at other. citywide schools. The memorandum stated:

> However, the major factor in the under-representation of black and Hispanic students appears to be the inadequate preparation of Boston public school students for admission to the Latins in comparison to preparation for the entrance examinations of students receiving their pre-secondary school training in private and parochial schools.

*Id.* at 11.

Nor did the Circuit Court decision deal with other provisions of the so-called final orders entered September 3, 1985, such as ¶ 4 regarding Parent Councils; ¶ 6 regarding the Department of Implementation; and ¶ 8 requiring that proposed modifications of orders previously entered be negotiated under the leadership of the State Board.

Although *Nucci* terminated the Court's jurisdiction in the area of student assignments, it affirmed the Court's continuing jurisdiction over faculty and staff desegregation. This jurisdiction was reaffirmed three and a half years later, in *Morgan v. Burke,* 926 F.2d 86 (1st Cir.1991), *cert. denied,* 503 U.S. 983, 112 S.Ct. 1664, 118 L.Ed.2d 386 (1992), on the ground that unitariness in the area of faculty and staff had not been achieved. Indeed, the Court's jurisdiction over faculty desegregation continues to the present time, and the BSC is still obliged to comply with ¶ 3 of the orders entered on September 3, 1985, and later modified. The operative provision is as follows:

> [T]he orders in this paragraph shall expire when black and other minority faculty and staff shall have attained seniority to such an extent that, were a RIF [reduction in force] to occur based upon the seniority provisions of applicable collective bargaining agreements reducing faculty and staff by 3% . . . the racial/ethnic proportions of

faculty and staff after such a RIF would, in the written opinion of the Superintendent of Schools, be substantially the same as those existing before it.

Also, the Circuit Court included a condition subsequent in its ruling ending further Court involvement in student assignments:

> [T]here is the possibility that factual considerations touching on the assignment issue may not have been fully examined. Thus, in vacating the student assignment orders, we authorize the court, on remand, to hold a further hearing on whether the schools have reached unitariness in student assignments. If the court expressly finds on the basis of facts not adequately or accurately canvassed herein that unitary status has not yet been achieved in the student assignment area, it may, subject to our later review, enter the same or different remedial orders relative to student assignments.

*Nucci,* 831 F.2d at 326. However, no further hearing was sought by any party or scheduled by the District Court, which assumed that the set aside, not argued in or discussed by the Court of Appeals, would continue in operation. *Nucci* concluded its orders as to student assignments with the following footnote: "We have no reason to question the good faith of the present Boston school officials. . . . or to doubt that the return to local autonomy will do anything but preserve the gains the schools have made over the past 15 years." *Id.* at 326 n. 19. As will be seen *post,* the BSC fulfilled the First Circuit's expectations.

Soon after issuance of *Nucci,* Mayor Raymond Flynn hired two consultants, Michael Alves and Charles V. Willie,[8] to develop a new student assignment plan. After several months of consultations and hearings, the consultants, in December 1988, proposed a plan (the "Controlled Choice Plan" or "CCP") to the BSC. The BSC approved the CCP's general framework on December 28, 1988, and held a public hearing on February 14, 1989. Meanwhile, until the opening of

---

**8.** Both were closely associated with the Court's plan, Alves as Project Director for Boston Desegregation Assistance at the State Board, and Wil-

lie as one of the four Masters who designed the plan adopted by the Court in 1975.

the 1989–90 school year, the defendants continued to comply with the District Court orders as to student assignments and, except for entry elementary grades, did so until September 1990, three years after the Court of Appeals mandate.[9]

Early in 1989, the BSC appointed a High School Student Assignment Subcommittee, chaired by member Rosina T. ("Kitty") Bowman, to recommend development of a viable assignment plan for high school students. The subcommittee met several times between October 30, 1989 and February 5, 1990; however defendants have, to date, been unable to locate any records of its meetings. On February 27, 1989, the BSC voted to adopt the new student assignment plan, and authorized its implementation subject to procedures set forth in long-standing orders of the District Court, as follows:

ORDERED, That the School Committee approve the Controlled Choice Student Assignment Plan submitted on December 28, 1988 and amended by the School Committee on February 7, 1989 and February 27, 1989, and authorize the School Department to undertake the necessary preparations for implementation of the plan, subject to further modification *pursuant to the procedures set forth in paragraph 8 of the final Orders in Morgan v. O'Reilly.* (Emphasis added)

The CCP, which was scheduled for implementation at entry elementary grades in September 1989 (Phase I) and systemwide in September 1990 (Phase II), sought to advance the desegregative goals of the court's orders. For example, its preamble stated at pp. 11–12:

A well-designed and implemented Controlled Choice *plan will work to eliminate all vestiges of unlawful segregation,* prohibit future discriminatory assignment practices and will create a more equitable

framework within which parents, students and educators can operate an educationally diverse and distinguished system of public schools.... Controlled Choice is a constitutionally defensible and permissible student assignment strategy because it guarantees equitable school desegregation. (Emphasis added)

Toward implementing the new plan, the BSC unanimously adopted, on December 12, 1989, the following motion:

Resolved that the School Committee direct their Office of General Counsel to initiate *the 90–day process required for modification of orders in Morgan vs. O'Reilly,* so that the second phase of the new Student Assignment Plan adopted herewith may be implemented. (Emphasis added)

Also, on December 12, 1989 at the same meeting, the BSC voted to continue in effect the examination school admission policies and racial percentage guidelines which had been established by the District Court, viz., the 35% set aside that this case is all about.

The context in which the BSC decided to continue the set aside was much larger than the bare judgment in *Nucci,* including (a) earlier court rulings mandating the set aside, and the opinion in *Nucci* not mentioning it in any way; (b) the First Circuit's expectation that the BSC would "preserve the gains the schools have made over the past 15 years"; (c) the affirmative action policy embodied in the state Racial Imbalance legislation;[10] (d) the monitoring role of the State Board of Education and its presiding over ¶ 8 negotiations concerning the proposed CCP; (e) the Mayor's hiring in 1988 consultants who had been intimately connected with the formulation and implementation of the 1975 desegregation plan; (f) the continuation of the Court's jurisdiction over several subdivisions of its desegre-

---

9. The BSC's continuing reliance upon orders previously vacated by the Court of Appeals extended until at least 1993. For example, on March 24, 1993, the BSC passed a resolution to modify the CCP so that students on waiting lists at schools with vacant seats might transfer "without regard to race, *to the extent that such action does not violate the Federal District Court's final orders* in the *Morgan* case." (Emphasis added)

10. Enacted in 1974, the state Racial Imbalance Act, Mass.Gen.L. ch. 71, sec. 37D, exempted public schools to which the passing of a competitive examination was a condition of entrance; provided, however, that the BSC "establish and maintain an affirmative action program to recruit and assist non-white students to enter and to remain in attendance at such school."

gation plan other than student assignments, such as the 10–year UFP plan for construction and repair of facilities which remained in force until 1995; (g) the permanent injunction entered repeatedly in previous orders, enjoining defendants "from creating, promoting, or maintaining racial segregation in any school or other facility in the Boston public school system"; and (h) the aim of the CCP to eliminate *all vestiges* of unlawful segregation. Thus, the BSC's action in preserving the 35% set aside may and should be judged in the light of all the attendant circumstances.

Demographically, the set aside originally ordered in 1975 reflected roughly the percentages of black and Hispanic students in the total public school population of the City at that time. Since then, however, the percentages of black and Hispanic students in the total student population have steadily increased while the set-aside percentage has remained the same. Illustrative figures, dating back to the *Nucci* decision, are shown in the following table. Also shown are the percentages of blacks and Hispanics (combined) that would have been admitted to BLS had there been no set aside.[11]

| School Year | Percentage of Blacks and Hispanics in Boston Public Schools | Percentage of Blacks and Hispanics in BLS if no Set Aside |
|---|---|---|
| 1995–96 | 71% | 15% |
| 1994–95 | 70% | 15% |
| 1993–94 | 70% | 13% |
| 1992–93 | 69% | 17% |
| 1991–92 | 68% | 12% |
| 1990–91 | 67% | 18% |
| 1989–90 | 67% | 21% |
| 1988–89 | 66% | 12% |
| 1987–88 | 65% | 14% |

It would seem to follow that abandonment of the 35% set aside at the present time without adopting other remedial measures would, within the next six years or sooner, convert BLS into an overwhelmingly white and Asian–American school with a black and Hispanic enrollment of about 15%. It would also impact district middle schools in the way

11. All percentages are rounded down. Systemwide percentages are determined in October of

mentioned in *Nucci*, 831 F.2d at 323, converting several of them into overwhelmingly black and Hispanic schools. By such a change, the systemwide *de jure* segregation of the 1970's would probably be succeeded, at least in the middle schools, by runaway *de facto* segregation in the 1990's and beyond.

### LEGAL BACKGROUND

■ The constitutionality of affirmative action programs under the Fourteenth Amendment has been the subject of several Supreme Court opinions handed down by sharply divided Courts, often producing plurality rather than majority decisions. However, many principles emerging from them are solidly established, e.g., (a) that "all racial classifications, imposed by whatever federal, state or local governmental action, must be analyzed by a receiving court under strict scrutiny." *Adarand Constructors Inc. v. Pena,* —— U.S. ——, ——, 115 S.Ct. 2097, 2113, 132 L.Ed.2d 158 (1993); (b) that remedying the effects of societal discrimination alone is never "sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination *by the governmental unit involved* before allowing limited use of racial classifications in order to remedy such discrimination." *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 274, 106 S.Ct. 1842, 1847, 90 L.Ed.2d 260 (1986) (plurality opinion) (emphasis added); and (c) that under strict scrutiny a racial classification must be "narrowly tailored" to serve an identified compelling governmental interest. *United States v. Paradise,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). The parties in this case are in agreement as to all these propositions.

■ However, the strict scrutiny test is not applied to merely race-conscious, or race-neutral, as distinguished from racially preferential, classifications. The scrutiny in such instances is "intermediate" and the standard is whether the classification serves an "important" governmental interest and is "substantially related" to achieving it. For example, in *Jacobson v. Cincinnati Bd. of Ed.,* 961

each school year.

F.2d 100, 103 (6th Cir.1992), the local school committee fixed the racial percentages of teachers at schools within 5% of the racial percentages of all the public school teachers in the district. The same race-conscious plan was in effect in *Kromnick v. School Dist. of Phil.*, 739 F.2d 894, 903 (3d Cir.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 782, 83 L.Ed.2d 777 (1985). In both cases, the plans survived intermediate scrutiny.

*Martin v. School Dist. of Phil.*, 1995 WL 564344 (E.D.Pa.1995), dealt with a motion for injunctive relief filed by public school students challenging, as violative of their rights under the Fourteenth Amendment, a 35%/65% student transfer policy whereby their applications for transfers were denied on account of their race. Under the policy, students were not permitted to transfer *from* a school having 35% or fewer students of the same race as the applicant or *to* a school with 65% or more students of the same race. In denying plaintiffs' motion for injunctive relief, the court explained the applicable legal principles as follows:

> The plaintiffs contend that race-based policies should be subject to strict scrutiny under the Fourteenth Amendment; in other words, they argue that such policies must be narrowly tailored to serve compelling state interests in order to be constitutional.... It should be noted, however, that the Court of Appeals for the Third Circuit [in *Kromnick* ] has held that an intermediate standard of review is more appropriate when a given policy, such as the one involved here, is race-conscious but not race preferential; race-conscious means that although the policy considers race it ultimately impacts all races equally.... The interest served by the 35%/65% student transfer policy is the remedying of the de facto segregation in the Philadelphia public schools in order to insure that equal educational opportunities are provided across racial lines..... And there can be little doubt that the state's interest in ensuring equal educational opportunities across racial lines is a compelling one.

(citations omitted).

In some respects, the development of the law in this politically charged area is far from complete. For example, on July 1, 1996, the Supreme Court denied certiorari in *Hopwood v. State of Texas*, 78 F.3d 932 (5th Cir.1996), a case in which the Circuit court stated: "We agree with the plaintiffs that *any consideration* of race or ethnicity by the law school *for the purpose of achieving a diverse student body* is not a compelling interest under the Fourteenth Amendment." (Emphasis added). Respecting the denial of the petition for a writ of certiorari, Justice Ginsburg, joined by Justice Souter, wrote:

> Whether it is constitutional for *a public college or graduate school* to use race or national origin as a factor in its admissions process *is an issue of great national importance.....* (emphasis added).

—— U.S. ——, 116 S.Ct. 2581, 135 L.Ed.2d 1095 (1996). Surely no less can be said about the admissions process of a public secondary school in a large city.

The need for further development of relevant law was implied in an opinion of Chief Judge Posner in a suit filed by three white correctional officers who applied unsuccessfully for a lieutenant's position to which a black officer was appointed. *See Wittmer v. Peters*, 87 F.3d 916 (7th Cir.1996), stating:

> It used to be thought that "subject to strict scrutiny" was a euphemism for "absolutely forbidden" ("strict in theory, fatal in fact," was the refrain). Some justices expressly reject this equation.... All that is clear is that discrimination in favor of a minority is sometimes permissible to rectify past discrimination against that minority by the discriminating institution. But this does not establish that there are any other exceptions besides the one for correcting past discrimination.

*Id.* at 918. The countervailing statement to which the judge was referring is Justice O'Connor's in *Adarand*, as follows:

> Finally, we wish to dispel the notion that strict scrutiny is "strict in theory, but fatal in fact." ... The unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it.

—— U.S. at ——, 115 S.Ct. at 2117 (citation omitted).

■ Finally, the background of legal principles against which we shall proceed to discuss the parties' positions includes the following procedural rules: while the party seeking to justify an affirmative action measure—here the defendant BSC defending use of the 35% set aside—bears the initial burden of producing "a strong basis in evidence" in support of the measure, the "ultimate burden" of proof rests with the party challenging it to prove that it is unconstitutional. *Wygant,* 476 U.S. at 277, 106 S.Ct. at 1848 (plurality opinion). Thus, in the case at bar, the burden on the BSC is merely one of production: it must demonstrate that there is "*a strong basis in evidence* for [its] conclusion that remedial action was necessary." *Concrete Works of Colorado v. City of Denver,* 36 F.3d 1513, 1521–22 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1315, 131 L.Ed.2d 196 (1995). If it does so, the ultimate burden of proving that the evidence before the BSC did not reasonably support an inference of prior discrimination, or that the set aside adopted by the BSC on the basis of this evidence was not sufficiently "narrowly tailored" rests with the plaintiff.

### Procedural Objections

■ Before addressing the substance of plaintiff's motion, we consider certain procedural objections raised by defendants. First, they object to the court's deciding her motion for admission to BLS for the upcoming school year without a second hearing geared specifically to this issue. Courts may, however, order preliminary relief without a hearing where the record is sufficiently developed for a fully informed decision. *See, e.g., Aoude v. Mobil Oil Corp.,* 862 F.2d 890, 893–94 (1st Cir.1988). Here, the Court has already received submissions and held a comprehensive hearing on the propriety of equitable relief. Moreover, it has received and reviewed the entire summary judgment record, and has held a hearing on the summary judgment motions pressed by each of the

parties. Finally, through the Order to Show Cause under Fed.R.Civ.P. 65, it has solicited, received, and considered the parties' arguments as to why plaintiff should or should not now be admitted. From this, the Court has gained an intimate familiarity with the equities of the pending questions, and rules that a further hearing would serve no useful purpose. Accordingly, this first objection by the defendants is overruled.

Second, defendants argue that an order of admission, though called "preliminary," would effectively be permanent, since, in the event of a final judgment for defendants, ordering plaintiff's dismissal from BLS might well be inequitable. The short answer is that problems contingent upon the outcome of this case are too hypothetical for the Court to address at this time, except to add that the hypothetical burden upon defendants of having to keep plaintiff at BLS after final judgment seems too slight to be controlling. The second objection is also rejected.[12]

### DISCUSSION

This case differs in important respects from the decisions of appellate courts cited *ante* in the section entitled Legal Background because it concerns the rights of public secondary school students under policies adopted by a local school committee. The contrast between the limited jurisdiction of courts and broad authority of school authorities was described in *Swann v. Charlotte Mecklenburg Bd. of Ed.,* 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1971), as follows:

School authorities are traditionally charged with broad power to formulate and implement educational policy and might well conclude, for example, that in order to prepare students to live in a pluralistic society each school should have a prescribed ratio of Negro to white students reflecting the proportion for the district as a whole. To do this as an educational policy is within *the broad discretionary powers of school authorities;* absent a finding of a constitutional violation,

---

12. We note in passing a third objection of defendants, viz., that plaintiff might also have been denied admission to BLS under a plan not involving a set aside. We have considered this objection but find it to be too speculative and unrelated to real events to warrant explication.

however, that would not be within the authority of a federal court. (Emphasis added.)

In December 1989, the BSC was under no compulsion to adopt the affirmative action plan ordered by the Court in 1976. It did so in conjunction with its enacting the CCP. Generally speaking, the legal principles discussed *ante* were formulated in cases dealing with discrimination in employment or awarding contracts with governmental agencies. Decisions regarding equal educational opportunity have concerned college and university education. Hence, there is no judicial precedent "on all fours" with this case.

■ The particulars of plaintiff's burden in moving for a preliminary injunction are well settled:

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Mass. v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). The primacy of the third factor was stressed in *Gately v. Com. of Mass.*, 2 F.3d 1221 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994), as follows: "[T]he *sine qua non* of [the preliminary *injunction* standard] is whether the plaintiffs are likely to succeed on the merits. . . . *The heart of the matter* is whether 'the harm caused plaintiff without the injunction, *in light of* the plaintiff's likelihood of eventual success on the merits, outweighs the harm the injunction will cause defendants.'" *Id.* at 1225 (citations omitted). The four factors must be considered together and are interrelated in that the strength of one factor may offset the weakness of another and *vice*

*versa, id.* at 1232–33. We undertake first an equitable balancing of factors (1) and (2), viz., the potential harms to the parties.

### Balance of Potential Harms

■ Plaintiff's central complaint is the alleged violation of her right under the Fourteenth Amendment to equal protection of the laws. "When alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." 11A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, section 2948.1 at 161 and n. 21 (1995) (collecting cases). The Court of Appeals for the First Circuit seems not to have adopted this rule. On the other hand, in *Public Service Co. v. Town of West Newbury*, 835 F.2d 380, 382 (1st Cir.1987), which involved a procedural due process claim, the First Circuit acknowledged that some constitutional violations have "such qualitative importance as to be irremediable by any subsequent relief." In our opinion, the constitutional violation asserted by plaintiff in this case fits within that definition.

■ Adopting *arguendo* defendants' contention that a stronger showing of irreparable harm to plaintiff is required for a situation-altering injunction than for one which merely preserves the status quo, we also find that she has made such a showing in this case. A similar issue was presented in *Faulkner v. Jones*, 10 F.3d 226 (4th Cir. 1993), in which a female applicant sought admission to the all-male school known as The Citadel. The Fourth Circuit there affirmed a grant of a preliminary injunction to plaintiff with little discussion beyond acknowledgment that what was at stake was plaintiff's constitutional right to equal protection of the laws.[13]

True, unlike plaintiff Faulkner, the plaintiff is receiving a fine education at a comparable school, Boston Latin Academy. There is, however, no need to compare the relative strengths and weaknesses of these two excellent schools. Suffice it to say that, in our

---

13. Incidentally, one of the three sources of irreparable harm claimed by Faulkner was her inability to begin the "bonding" process with her prospective classmates and teachers. In the case at bar, plaintiff will suffer similar harm if she is required to wait another year for admission to BLS.

view, their programs, facilities, and cultural pairings entitle plaintiff without further delay to learn firsthand the expectations of the faculty and administration at BLS, and to acquire the study habits necessary for success there.

Plaintiff has recently completed the seventh grade at Boston Latin Academy, her second choice. If she is entitled eventually to attend the unique educational programs available only at BLS, and cannot be admitted now, she must wait until entry of final judgment in these proceedings, which may well not occur until next year. Defendants submit that the considerations relevant to plaintiff's motion are not substantially different from those a year ago when her motion was denied. We disagree on two counts. First, from plaintiff's standpoint, if she is to be a member of the BLS class of 2001, it is important for her to get to know her classmates and teachers, and also the atmosphere of the school, without missing the eighth grade. In this respect, harm to plaintiff from denying her motion at this time would be greater than was shown a year ago. Second, when plaintiff's relief was denied last year, an important consideration was whether BLS would receive numerous applications from students similarly situated to plaintiff, especially within days before the beginning of the 1995–96 school year.[14] The number of students now similarly situated to plaintiff, (i.e., who were excluded from BLS by the set aside and have satisfactorily completed the seventh grade at Boston Latin Academy) is but a fraction of the number of students similarly situated to her a year ago.

The harm which the defendants would suffer from granting the preliminary injunction is difficult to describe as anything but minimal. Unlike *Faulkner*, this is not a class action. Also, procedures for integrating a transfer student into the student body at BLS were established years ago, and accommodating plaintiff will place no special burden on defendants. At a status conference last spring, defendants agreed to provide her

with a list of books to be read in preparation for admission to the eighth grade at BLS.

A critical consideration in finding that plaintiff's showing of potential irreparable harm is sufficient for preliminary relief is the strong likelihood that she will succeed on the merits. *See Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1270 (6th Cir. 1985). As explained in the next subsections of this memorandum, on the record before the Court at this juncture of the proceedings, the set aside resulting in plaintiff's denial of admission to BLS as a seventh grader will probably not pass the controlling strict scrutiny test.

### *Likelihood of Success*

▮▮▮▮ Of the four factors which plaintiff must show to obtain a preliminary injunction, the "primary integer" is plaintiff's likelihood of success on the merits. *Brooks v. New Hampshire Supreme Court*, 80 F.3d 633, 637 (1st Cir.1996). As demonstrated *ante* under Legal Background, she will prevail unless defendants produce a strong basis in evidence justifying the racial quota which led to denial of her application to BLS. Two major issues are presented: (a) whether or not the set aside serves a compelling governmental interest; and (b) whether or not narrowly tailored to serve such interest. Defendants suggest two compelling goals, first, to remedy "the lingering effects" of prior racial discrimination; and second, to achieve benefits for all students at BLS and for the entire Boston community which flow from a racially and ethnically diverse student body at BLS.

### A. Eradicating the Lingering Effects of Discrimination

It became common knowledge during the *Morgan* litigation that racial discrimination characterized the Boston school system for many years before 1972, when the *Morgan* complaint was filed. *See Morgan v. Hennigan*, 379 F.Supp. 410, 417–18 (D.Mass.1974). A critical question in the instant case is whether *Nucci's* holding that the BSC had achieved unitariness in the area of student

---

**14.** Not every applicant decides ultimately to enroll there. For example, last year approximately 40 students who ranked higher than plaintiff on the list of invitees chose to enroll at a school other than BLS.

assignments meant that the effects of this discrimination had been completely eliminated. Plaintiff argues for such a reading, asserting that unitariness "meant that the admission process at BLS was no longer tainted by *de jure* segregation *or its effects*." (emphasis added). If plaintiff is correct, the 35% set aside cannot be remedial of past discrimination and the "lingering effects" issue disappears from the case.

We have a very different view. In our understanding, *Nucci* did not consider whether all the effects of prior discrimination had been eradicated. It focused its analysis on three specific grounds: BSC's good faith, its dismantling one-race schools, and its desegregating the schools as much as practicable. True, the physical effects of prior segregative discrimination had been largely eliminated by assigning student members of the black and Hispanic plaintiff classes to schools also attended by white students, and by redrawing of district lines, renovating deteriorating buildings, arranging efficient transportation and the like. However, *Nucci* said little or nothing about the lingering impact of societal discrimination and segregation upon the character and potential of minority pupils, so classically portrayed in *Brown v. Board of Ed.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). Moreover, as set forth in detail in the Factual Background subsection, tangible, physical effects of prior discrimination continued for several years after 1989 in several areas of the Court's remedial orders.

Proceeding on the basis of our understanding of *Nucci*, a good starting point is Judge Posner's colorful framing of the issue in the recent *Wittmer* case cited *ante* in the Legal Background subsection. Referring to strict scrutiny of an affirmative action practice regarding correctional officers, he wrote:

While we may assume that a practice that is subject to the skeptical, questioning, beady-eyed scrutiny that the law requires when public officials use race to allocate burdens or benefits is not illegal per se, it can survive that intense scrutiny only if the defendants show that they are motivated by a truly powerful and worthy concern and that the racial measure that they have

adopted is a plainly apt response to that concern. They must show that they had to do something and had no alternative to what they did.

*Wittmer*, 87 F.3d at 918. In the case at bar, there is no question about the defendants' motivation and concern. The issue is whether they adopted "a plainly apt response." Evidence pertinent to this question is described as follows in the *Wygant* case, also cited *ante* in the Legal Background subsection:

This Court never has held that societal discrimination alone is sufficient to justify a racial classification. Rather, the Court has insisted upon some showing of prior discrimination by the governmental unit involved before allowing limited use of racial classifications in order to remedy such discrimination. This court's reasoning in *Hazelwood School District v. United States*, 433 U.S. 299 [97 S.Ct. 2736, 53 L.Ed.2d 768] (1977), illustrates that the relevant analysis in cases involving proof of discrimination by statistical disparity focuses on those disparities that demonstrate such prior governmental discrimination.

476 U.S. at 274, 106 S.Ct. at 1847 (plurality opinion). The *Hazelwood* decision therein cited states: "where gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination." 433 U.S. at 307–308, 97 S.Ct. at 2741.

Defendants have submitted statistics regarding the disparity between the numbers of black and Hispanic students who apply for admission to BLS and the numbers admitted; also the disparity between the numbers of applicants deemed qualified because scoring above the 50th percentile and the numbers admitted to BLS. It remains to be seen at trial whether the disparity is as gross and significant as defendants contend. Presumably, this will be a subject of expert testimony. Already in the record on this question is the affidavit of Headmaster Contompasis, as follows:

The statistical evidence set forth by Dr. Ellerin in her expert report in this case shows that black and Hispanic students attending the Boston Public Schools re-

ceive invitations to attend Boston Latin School at a significantly lower rate than do black and Hispanic students attending private and parochial schools, whereas the invitation rates for white public school and white independent school students are comparable. While there are many factors that probably contribute to this difference, I consider it unlikely that the Boston public school system is not shortchanging its black and Hispanic students in some fashion that contributes both to this difference and to the consistent relative lack of success in such students' obtaining invitations to attend Latin School in the period following the Court's finding of intentional discrimination.

While societal discrimination alone is insufficient to justify a racial classification, it does not follow that it is irrelevant. While not in the record before us at this juncture of the proceedings, expert evidence at trial may ascribe a lesser number of black and Hispanic applicants for admission to BLS because so few applicants were admitted in former days. Similarly, past discrimination may be connected with minority students' lower GPA's in the sixth grade than would have been obtained in its absence. In sum, defendants have demonstrated plausible grounds for contending that the set aside is an apt response to lingering effects of prior discrimination.

Defendants' additional burden at trial will be to demonstrate the causal connection between defendants' conduct ten or more years ago and current lingering effects. The consequences of any action or omission fade with the passage of time. The duration of this alleged causal connection, *see Podbersky v. Kirwan*, 38 F.3d 147, 153 (4th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2001, 131 L.Ed.2d 1002 (1995), will also be explored at trial. This is the "gap" in the evidence presented thus far to which the Court referred in its Order to Show Cause under Fed. R.Evid. 706 dated April 17, 1996.

### B. Student Body Diversity

Defendants also assert that a compelling state interest advanced by the 35% set aside is educational diversity. In this context, the phrase "educational diversity" is less than fully explanatory, as there is wide agreement that preferential measures undertaken for the sole purpose of assuring within a student body "some specified percentage of a particular group merely because of its race or ethnic origin ... must be rejected not as insubstantial but as facially invalid." *University of California Regents v. Bakke*, 438 U.S. 265, 307, 98 S.Ct. 2733, 2757, 57 L.Ed.2d 750 (1978) (opinion of Powell, J.). It is, rather, the many educational benefits to which racial ethnic diversity might be thought a conduit that, when taken together, constitute the compelling diversity interest defendants here assert.

Components of this interest noted by Charles V. Willie, one of defendants' experts, include the instillation into BLS students of the negotiation skills deemed necessary to defuse community racial tensions; the placing of black and Hispanic students into an educational setting which will eventually lead to better job prospects; the promotion of greater cultural understanding and the diminution of racial prejudice; and the fostering of a tolerant ethos in BLS students, many of whom, defendants predict, will assume positions of civic responsibility. This multi-faceted interest in educational diversity is well summarized by BLS Headmaster Michael G. Contompasis:

> One of the greatest strengths of Boston Latin School is the rich diversity of the talented students who attend the school. We have the children of prosperous professionals as well as students from poor, broken homes with children of their own. I am convinced, based on dealings with hundreds of Boston Latin School students over the past twenty years, that the encounter of these students with each other permits them to learn important lessons that would otherwise be very difficult to teach, lessons of tolerance, sensitivity and critical thinking.

Whether such an interest is "compelling" in a constitutional sense, and therefore can justify racially preferential measures designed to promote it, is the big question. The strongest Supreme Court authority suggesting an affirmative answer remains Jus-

tice Powell's judgment-announcing opinion in *Bakke. See* 438 U.S. at 311–15, 98 S.Ct. at 2759–61, stating "[I]t is not too much to say that the 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." (citation omitted). Other Court pronouncements also have shown its appreciation for the benefits of racially and ethnically diverse educational environments. *E.g., Washington v. Seattle School Dist. No. 1,* 458 U.S. 457, 473, 102 S.Ct. 3187, 3196, 73 L.Ed.2d 896 (1982) ("Attending an ethnically diverse school may help ... prepar[e] minority children 'for citizenship in our pluralistic society,' while, we may hope, teaching members of the racial majority 'to live in harmony and mutual respect' with children of minority heritage.") (citations omitted).

Counterposed to these statements must, however, be the Fifth Circuit's recent flat out rejection of the argument that the University of Texas Law School can take race and ethnicity into account in its efforts to achieve a "diverse" student body. *See Hopwood,* 78 F.3d at 941–48. And yet *Hopwood* must, in turn, be read with an awareness of that which Justice Ginsburg (joined by Justice Souter) suggested in her opinion issued in conjunction with the Supreme Court's denial of *certiorari* in that case: that at least two Supreme Court justices do not view *Hopwood* as the final word on this important question. So too must it be read with an understanding that it involved a *law school,* where the educational mission is so obviously different from that of a public secondary school in a racially diverse municipality. *Cf. United States v. Fordice,* 505 U.S. 717, 728–29, 112 S.Ct. 2727, 2736, 120 L.Ed.2d 575 (1992) ("[A] state university system is quite different in very relevant respects from primary and secondary schools.") It is with all these factors in mind that we denied plaintiff's motion for summary judgment.

15. Contrary to plaintiff's summary judgment argument, formal contemporaneous legislative *findings* are not necessary for any racially preferential plan to pass muster. *See Aiken v. City of Memphis,* 37 F.3d 1155, 1162–63 (6th Cir.1994); *see also Wygant,* 476 U.S. at 289, 106 S.Ct. at 1854 (opinion of O'Connor, J.).

## C. Narrow Tailoring

The second major component of the strict scrutiny inquiry is whether the challenged plan is "narrowly tailored" to advance any compelling government interests defendants may establish. As the Court has explained, a definitive ruling on this narrow-tailoring prong must be deferred until all the evidence on the compelling interests asserted by defendants has been received, as the propriety of the set aside should, in the end, be decided in light of the permissible goals it seeks to achieve. Nonetheless, the case has advanced far enough for the Court to state that, however proper it once might have been, the set aside is probably no longer narrowly tailored.

■ The leading case discussing the narrow tailoring requirements is *Paradise,* 480 U.S. at 149, 107 S.Ct. at 1053. Distilled to its essence, *Paradise* makes clear that, for a racially preferential measure to be narrowly tailored, it must be the product of responsible decision-making [15] and necessary to the achievement of the compelling interests that animate it. As to its necessity, factors to be considered are whether those who benefit from the plan are qualified; whether less racially preferential alternatives are feasible; its duration; whether and how much harm comes to others by its implementation; and whether it is subject to periodic review. *See id.* at 171, 107 S.Ct. at 1066. In 1991, then Chief Judge Breyer, writing for the First Circuit Court of Appeals, held that the *Paradise* factors had been met in a consent decree, containing racially preferential promotion provisions, that had been entered into by the Boston Police Department and a class of black police officers. *See Stuart v. Roache,* 951 F.2d 446 (1st Cir.1991), *cert. denied,* 504 U.S. 913, 112 S.Ct. 1948, 118 L.Ed.2d 553 (1992). Central to the determination that the decree was narrowly tailored were the facts that (1) the pool of benefitting officers was qualified; [16] (2) the promotional

16. Subsequent to *Stuart,* the First Circuit again emphasized the particular importance of this narrow tailoring criterion: "In this case, only *qualified* minority candidates are specially advantaged; no minority candidate is placed on the eligibility list unless he or she has attained a passing score on the entrance examination. This

goals were linked to the size of the relevant, qualified labor pool; (3) the preference was mild and was likely to terminate the following year; and (4) the decree explained why alternative, race-neutral relief would likely prove inadequate. *Id.* at 454–55.

In our view, rote application of the *Paradise* and *Stuart* narrow tailoring criteria to the BSC's voluntary continuation of the set aside yields an insufficient evaluation of the set aside's propriety. It is true that, for example, the BSC never explicitly considered, on the record, the availability or feasibility of alternative plans. And it is also true that the set aside has no built-in termination provision. It must be remembered, though, that the set aside had its origins in a court-ordered desegregation plan; that it had already played a crucial and successful role in desegregating the once virtually all-white examination schools; that the First Circuit had in no way called its validity into question in returning to the BSC control over student assignments; and that the appeals court had, if anything, strongly hinted that in-place corrective measures ought to be continued. Indeed, it may not be too much of a stretch to say that, without the set aside, there would not have been a finding of unitariness with respect to student assignments at all. These facts should not be discounted.

Nonetheless, while these facts may in some measure, if not completely, justify both the merits of the set aside and the means by which the BSC voluntarily continued it after *Nucci* was handed down in 1987, they are not sufficient to answer plaintiff's charge here: that however justifiable and appropriate the set aside might once have been, it is not now, in August 1996, narrowly enough tailored to pass constitutional muster. Though a definitive answer to this charge must await trial, we believe that this argument has considerable force. First, the set aside still does not have a built-in termination provision. *Cf. Burke,* 926 F.2d at 89–92 (affirming paragraph 3 of the Final Judgment in the *Mor-*

*gan* case because, *inter alia,* it is effective only until newly-hired black and Hispanic faculty and staff will have achieved such seniority that a RIF of 3% will not substantially dilute district-wide percentages). Second, defendants do not appear to have explored the feasibility of less racially preferential plans for keeping BLS accessible to "qualified" students of all races and ethnicities, and not just to those students who, for a myriad of reasons, tend to excel on standardized examinations at the tender age of 12. Third, and most importantly, such plans may well be available for defendants' consideration.

For example, defendants could change the present examination school election system so that separate applications are required for each school, and then assign a certain percentage of seats in each examination school to each racial and ethnic group, tailoring the percentages to the relevant qualified applicant populations and revisiting the policy periodically so as to ensure that demographic shifts and other factors do not render it obsolete. The Supreme Court has endorsed the BSC's prerogative in this regard. *See Swann,* 402 U.S. at 16, 91 S.Ct. at 1276. And there is precedent for plans of this sort. *Cf., e.g., Jacobsen,* 961 F.2d at 102–03 (plan whereby faculty percentages at each school must be within 5% of the district-wide racial makeup is a race neutral policy that impacts all equally and survives analysis under intermediate scrutiny); *Martin,* 1995 WL at 564344 (similar, but involving a student assignment plan and holding that it survives strict, as opposed to just intermediate, scrutiny). Such a policy would tend to promote racial and ethnic diversity without employing a constitutionally-suspect set aside that runs in favor of only two racial ethnic groups.

Or, admission to the examination schools could be conducted by lottery after examination results (perhaps in combination with sixth grade marks) establish the pool of students qualified for admission to BLS. *Cf. Wygant,* 476 U.S. at 310, 106 S.Ct. at 1865, a

---

is an important indicium of narrow tailoring." *Mackin v. City of Boston,* 969 F.2d 1273, 1278 (1st Cir.1992) (emphasis in original), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1043, 122 L.Ed.2d 352 (1993). There is no dispute in this case that only "qualified" applicants benefit from the set aside.

Since it was instituted in 1976, the traditional criterion for determining whether one is "qualified" for admission to BLS—an examination score at or above the 50th percentile—has never been challenged as inappropriate.

case in which Marshall, J., dissenting, suggested the use of a lottery so as to preserve desegregation gains without placing any one nonminority teacher more at risk of losing his job than a minority teacher would be. In the past several years, approximately 65–70% of qualified applicants have been white or Asian–American; 20–25% have been black; and 7–10% have been Hispanic. Thus, a lottery could be expected to at least approximate BLS's current racial and ethnic mix.

Or, defendants could reserve some specified percentage, say one-third, of the seats in BLS's incoming classes for those with the highest examination score/sixth grade mark rankings, and then admit the rest of the class by lottery from among the pool of students with examination scores that qualify them for admission. An experiment somewhat along these lines is now under way at Lowell High School in San Francisco pursuant to a court-approved consent decree.

For all these reasons, the set aside is likely not narrowly tailored, and plaintiff is therefore likely to succeed on the merits of her equal protection claim.

*Public Interest*

■ The final criterion of the preliminary injunction inquiry is whether the issuance of the injunction sought by a plaintiff would have such an adverse effect upon the "public interest" that, despite entitlement thereto under application of the other three tests, the injunction should not issue. *See generally* 11A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure, § 2948.4 at 200–01 and 205 (1995), stating that the public interest inquiry asks whether "there are policy considerations that bear on whether the order should issue," and that courts should give "considerable weight" to whether "the public interest might be … *injured* by an injunction." (emphasis added). *Cf. Jelliffe v. Berdon,* 345 F.Supp. 773, 779 (D.Conn.1972).

Applying these principles to this case, the question becomes whether transfer of one eighth grader from Latin Academy to BLS would be contrary to the public interest. By answering this question in the negative, the Court is not implying that additional transfers would not be contrary to the public interest. Indeed, a year ago, an important factor in denying plaintiff admission to BLS was the possibility that other unsuccessful applicants might construe plaintiff's complaint as a substitute for, or as equivalent to, a class action, which it is not.

The principal interest at issue here is the orderly operation of the two schools involved, BLS and Latin Academy. The Court finds that granting the renewed motion of one plaintiff who has already completed the seventh grade at Latin Academy would not damage that interest. BLS occasionally accepts transfer students, and arrangements have already been made to receive plaintiff as an eighth grader if she prevails on her motion.

Additionally, a preliminary transfer order will allow time for the Court to seek additional evidence and to give due consideration to the weighty policy implications of this potentially protracted litigation without keeping plaintiff, who is entering the critical eighth grade year, on pins-and-needles about her educational future. Her admission now will create "breathing room" and remove from the agenda of the Court and parties deadlines linked to the school calendar. Thus, the preliminary injunction ordered here not only does not harm the public interest, it affirmatively serves it.

*CONCLUSION*

Plaintiff's admission to BLS when classes resume on August 29 will satisfy one of the two purposes of her complaint, albeit a year later than she would have preferred. A year ago, her admission as a seventh grader would have been disruptive, if not as chaotic as was predicted by defense counsel. Now, however, according to assurances received by the Court at a status conference in March, BLS is prepared for plaintiff's enrollment as an eighth grader, and her transfer from Latin Academy will be uneventful.

The second purpose of her complaint is to obtain a final judgment (plus potentially sizeable attorneys' fees and expenses sought in prayers 6 and 7 of the complaint) to the effect that her constitutional rights under the Fourteenth Amendment were violated by de-

fendants' use of a racially preferential set aside. This part of her case remains. It may eventually present a challenge to each of the defendants and indirectly to the City as a whole. If plaintiff prevails and the set aside be declared unconstitutional, what, if any, steps will the defendants take to prevent its premier secondary school from returning to its former status as identifiably white, now that the system has become 72% black and Hispanic?

Mindful of the caveat that findings supporting preliminary injunctions are themselves preliminary, i.e., forecasts of findings which a trial on the merits may disprove, *e.g.,* *Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 6 (1st Cir.1991); *Aoude,* 862 F.2d at 894, we find preliminarily that plaintiff has satisfied all four required conditions by showing irreparable harm to herself if a preliminary injunction be again denied; less harm to defendants if granted; likely success on the merits; and no adverse effect on the public interest. As to the strict scrutiny test, the respective burdens of production and proof will be significant and perhaps dispositive at trial. As yet, defendants have not produced a strong evidentiary basis for concluding that there exists a causal connection between segregative discrimination by predecessor school committees and lingering effects thereof. Nor have they produced an evidentiary foundation which tends to prove the indispensability of the challenged set aside in achieving a compelling government interest, i.e., the unavailability of alternative, less racially preferential means of achieving the same goal.

If less racially preferential means of achieving the remedial and educational goals of the set aside do prove to be available, their development and implementation will call for the same type of school committee initiative and leadership that produced the Controlled Choice Plan. In carrying out such a project, broad community participation will be important and national school associations can furnish expert assistance. In light of their generous contributions to the city's public schools over the past two decades, members of the Boston Compact[17] and the Boston Plan will doubtless cooperate. The same can be said of the resourceful BLS alumni association, which appears in this litigation as an amicus curiae.

In any event, and accordingly, plaintiff's application for a preliminary injunction is granted and defendants shall admit Julia A. McLaughlin to the eighth grade at Boston Latin School when the summer recess ends and classes resume on August 29, 1996.

So ordered.

---

**17.** Wellesley College, succeeded by Boston University, and the Federal Reserve Bank of Boston, succeeded by State Street Bank and Trust Co., were "paired" with BLS in the Court's plan. Such pairings, now known as Higher Education Partnerships, were later closely linked to the Boston Compact.