**Abigail Noel FISHER and Rachel Multer Michalewicz,**
**Plaintiffs,**

v.

**State of TEXAS, et al., Defendants.**

**Case No. A–08–CA–263–SS.**

United States District Court,
W.D. Texas,
Austin Division.

May 29, 2008.

Bert W. Rein (argued), Thomas R. McCarthy, Suzzette Rodriguez Hurley, David C. Rybicki, Wiley Rein LLP, Paul M. Terrill, The Terrill Firm, P.C., for Plaintiffs.

James C. Ho, Solicitor General (argued), Greg Abbott, Attorney General of Texas, Kent C. Sullivan, First Assistant Attorney General, David S. Morales, Deputy Attorney General for Civil Litigation, Robert O'Keefe, Chief, General Litigation Division, Ryan Clinton, Assistant Solicitor General, Mishell B. Kneeland, Assistant Attorney General, Marina Grayson, Assistant Attorney General, for Defendants.

## ORDER

SAM SPARKS, District Judge.

BE IT REMEMBERED on the 19th day of May 2008 the Court called the above-styled cause, the parties appeared either in person or through counsel, and the Court heard argument regarding Plaintiffs Abigail Fisher and Rachel Michalewicz's Motion for Preliminary Injunction [# 29], Defendants' Opposition to Motion for Preliminary Injunction [# 42], and the Plaintiffs' Reply thereto [# 45]. After considering the motion, the response, the reply, the arguments and exhibits presented at the hearing, and the relevant law, the Court enters the following opinion and order.

### Background

Plaintiffs Abigail Fisher and Rachel Michalewicz were denied summer and fall admission into the 2008 freshman class at the University of Texas at Austin ("UT"), although each was given the opportunity to participate in UT's Coordinated Admissions Program ("CAP"). Pl's Mot. for Prelim. Inj. at 1. Plaintiff Fisher was accepted to the undergraduate programs at Baylor University and Louisiana State University ("LSU"). Pl's Amend. Compl. ¶¶ 117–18. Plaintiff Michalewicz was accepted to the undergraduate program at Texas State University—San Marcos. Pl's Amend. Compl. ¶ 135. Plaintiffs allege the admissions policies and procedures employed by the University of Texas at Austin and applied to Plaintiffs discriminate against them on the basis of their race and in violation of their right to equal protection of the law under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. §§ 1981, 1983, and 2000d *et seq.* Plaintiffs seek a preliminary injunction requiring UT to re-evaluate their applications for admission without considering race as a factor and grant them admission if they would have been admitted absent the use of race pending the outcome of this suit on the merits. Pl.'s Mot. for Prelim. Inj. at 23.

UT has a complex admissions process with two major components. The first, most dominant, feature of UT admissions is what is commonly known as the "Top 10 Percent Law." Passed in 1997, House Bill 588 guarantees Texas public high school students graduating in the top 10 percent of their class admission to any state university, including UT. Tex. Educ.Code § 51.803 (1997). The vast majority of students at UT are admitted under the Top 10 Percent Law. For Fall 2008, eighty-one percent of students admitted to UT were admitted under the Top 10 Percent Law. Pl's Mot. for Prelim. Inj. Ex. 17. The remaining nineteen percent of students admitted to UT, as well as all of the applicants ultimately rejected, are evaluated under the "AI/PAI Plan." Def's Opp. at 3. The AI/PAI Plan is a multi-faceted, individual review process for admitting applicants who do not qualify for automatic admission under the Top 10 Percent Law, allegedly designed and developed from principles established by the Supreme Court in *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003). *Id.*; Def's Opp. at 15–16. In this program, UT computes two scores for each applicant, an Academic Index ("AI") and a Personal Achievement Index ("PAI"). *Id.* The AI is based on numerical data taken from the applicant's class rank, standardized test scores, and high school curricu-

lum. *Id.* at 3–4. The PAI is a more subjective, multi-factor, individualized assessment of each applicant. *Id.* at 4. The PAI is made up of three separate scores. *Id.* Two of the scores are based on two essays submitted by each applicant. *Id.* The third score is a subjective assessment of several factors: demonstrated leadership qualities, extracurricular activities, honors and awards, work experience, community service, and special personal circumstances. *Id.* As part of "special circumstances," the admissions process takes into consideration several sub-factors: the socioeconomic status of the family and the school, a single-parent home, whether languages other than English are spoken at home, family responsibilities, and race. Def's Opp. Ex. 3, Ishop Aff. ¶ 4. Each applicant's PAI is determined by readers specially trained to review applications according to consistent guidelines and methodology. Def's Opp. at 4.

After calculating applicants' AI/PAI scores, applicants are organized into a selection matrix. *Id.* Each major at UT has a different matrix and students are considered according to their major preferences, although in reality there is little availability in most majors other than Liberal Arts after application of the Top 10 Percent Law. *Id.* Applicants not admitted for their first choice of major are then considered for their second choice, then as undeclared liberal arts majors. *Id.* If a Texas resident is not admitted at this point but his or her scores fall just below those selected for admission, the application is read a second time and a determination is made whether to admit the student for the fall, the summer, or to UT's Coordinated Admissions Program ("CAP"). *Id.*

### Analysis

■ A preliminary injunction may be granted only if the moving party establishes each of the following four factors: (1) a substantial likelihood of success on

the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir.1991).

### I. Plaintiffs Have Not Established a Substantial Likelihood of Success on the Merits

■ To establish a substantial likelihood of success on the merits, the Plaintiffs must have shown: (1) a substantial likelihood they would have been admitted to UT but for UT's use of race in admissions and (2) a substantial likelihood UT's use of race would be found to unlawfully discriminate on the basis of race in violation of Plaintiffs' right to equal protection of the law under the Fourteenth Amendment of the United States Constitution. The record provides insufficient evidence to support a finding of a substantial likelihood the Plaintiffs would have been admitted to UT but for its use of race as a factor in admissions. The only evidence provided to the Court is the Plaintiffs' AI and PAI scores, as calculated by UT, and a list of over 500 admitted minority students, their AI and PAI scores, and the school to which they were admitted. Pl's Mot. for Prelim. Inj. Ex. 26. This evidence is insufficient for any appropriate comparison between the Plaintiffs and those applicants admitted and rejected from the same pool. While the minority applicants listed in Exhibit 26 were admitted to a variety of different schools ranging from engineering to architecture, the Plaintiffs only applied for admission to the schools of Business Administration and Liberal Arts. *Id.*; Def's Opp. Ex. 3, Ishop Aff. ¶ 18. The Plaintiffs would not have competed with students admitted to any school other than Business Administration or Liberal Arts.

Nor is it clear from the record to what extent race was a factor in the admission of minority students. Although race is one of many factors taken into consideration when determining an applicants PAI score, the Court cannot begin to guess which minority students actually benefitted from this consideration and which did not. The only relevant information the Court has relating to the admission of minority students in comparison to the Plaintiffs is that UT admitted 136 minority students with lower AI scores than Plaintiff Michalewicz[1] and 64 minority students with lower AI scores than Plaintiff Fisher.[2] Further complicating this analysis is UT's policy of giving Texas resident applicants a "second reading" when their application falls just below the applications selected for admission as undeclared liberal arts majors. Def's Opp. at 4. At that point a decision is made on a case by case basis whether to admit the applicant for the fall semester, the summer semester, or CAP. *Id.* The record shows both Plaintiffs' applications were given a second reading since UT offered them both admission to CAP. The record is silent as to which admitted minority students with lower AI scores than the Plaintiffs fell within the Liberal Arts school's matrix for admitted students and which were given a second reading. The Court also lacks any information regarding to what extent, if any, race plays a role in this second reading. According to Defen-

dants, at least one African–American student with a better AI score and an equal or better PAI than either Plaintiff was *denied* admission to the school of Liberal Arts and at least one white student with a worse AI than the Plaintiffs and a comparable PAI was *granted* admission to the school of Liberal Arts. Def's Br. of May 20, 2008 at 1–2[# 52]. Plaintiffs' AI and PAI scores alone compared to those of admitted minority students is insufficient evidence to establish a likelihood Plaintiffs would have been admitted but for UT's use of race in admissions. On the present record, the Court cannot find a substantial likelihood Plaintiffs would have been admitted but for UT's consideration of race in admissions.

■ The present record also fails to establish a substantial likelihood UT's use of race in undergraduate admissions unlawfully discriminates on the basis of race in violation of Plaintiffs' right to equal protection of the law under the Fourteenth Amendment of the United States Constitution. As Defendants contend and Plaintiffs admit, UT's admissions process was modeled on Michigan Law School's admissions program approved by the Supreme Court in *Grutter v. Bollinger*, 539 U.S. 306, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003); Pl's Br. of May 22, 2008 at 1 [# 54]; Def's Opp. at 15–16. As a racial classification, the admissions process must

---

1. Of those 136 minority students with an AI score lower than Plaintiff Michalewicz's, only one received admission to the school of Business Administration; the other 135 received admission to the school of Liberal Arts. Of those 136 admitted minority students, only four had a PAI score as low as Plaintiff Michalewicz's PAI score. There is a discrepancy as to Ms. Michalewicz's correct AI score. In calculating these numbers, the Court used the AI score reported by UT. Regardless of the precise AI score used, the Court's analysis of Plaintiffs' likelihood of success would remain the same.

2. All 64 minority students with an AI score lower than Plaintiff Fisher's received admission to the school of Liberal Arts. Of those 64 admitted minority students, 14 received the same PAI score as Plaintiff Fisher and two received a lower PAI score than Plaintiff Fisher. There is a discrepancy as to Ms. Fisher's correct AI score. In calculating these numbers, the Court used the AI score reported by UT. Regardless of the precise AI score used, the Court's analysis of Plaintiffs' likelihood of success would remain the same.

be analyzed under strict scrutiny, meaning the use of a racial classification is constitutional only if (1) it furthers a compelling governmental interest and (2) is narrowly tailored. *Id.* 327–328, 123 S.Ct. 2325.

In *Grutter*, the Supreme Court deferred to Michigan Law School's judgment that admitting a "critical mass" of minority students and obtaining a diverse student body was "essential to its educational mission" and held "that student body diversity is a compelling state interest that can justify the use of race in university admissions." *Id.* at 329–30, 325, 123 S.Ct. 2325. At the preliminary injunction hearing, the Court asked both sides to either define or explain who should be responsible for defining the "critical mass." The Plaintiffs argued the Court should determine when UT has reached "critical mass." Plaintiffs further argued "critical mass can be no greater than 20% minority enrollment" and no less than 10% minority enrollment. Pl's Reply at 4–5. Defendants argued defining "critical mass" should be left up to the university and that no "magic" number exists. UT articulated an interest in obtaining a diverse student body in order to improve discussion in the classroom, develop the next generation of Texas and national leaders, identify exemplary individuals of all stripes, and break down racial stereotypes. *See Grutter*, 539 U.S. at 330–33, 123 S.Ct. 2325 (Michigan Law School's admissions policy helps promote "cross-racial understanding," breaks down racial stereotypes, improves classroom discussion, "better prepares students for an increasingly diverse workforce," and helps develop the next generation of leaders).

In *Grutter*, the Supreme Court deferred to Michigan Law School and left the term "critical mass" largely undefined, referring to it as "meaningful numbers," "meaningful representation," "a number that encourages underrepresented minority students to participate in the classroom and

not feel isolated," or "numbers such that underrepresented minority students do not feel isolated or like spokespersons for their race." 539 U.S. at 318–19, 123 S.Ct. 2325. Nor will the Court, at this early stage of the litigation and based on a less than complete record, attempt to substitute its judgment of the level of minority admissions necessary to achieve "critical mass" for UT's judgment. Universities throughout the United States serve vastly different communities and constituencies in various geographic areas and pursue different missions, goals, and programs. Smaller schools may need fewer minority students in order to achieve critical mass than massive state universities like UT. The University of Hawaii or University of Wisconsin may have significantly different diversity needs depending on each school's circumstances than the University of Georgia or the University of Texas at Austin.

▮ The Court is better suited to determine whether, once a university has articulated a compelling interest in obtaining student body diversity, the means by which the university has chosen to further that interest is "narrowly tailored." *Grutter*, 539 U.S. at 334, 327–28, 123 S.Ct. 2325. As the Supreme Court explained:

> To be narrowly tailored, a race-conscious admissions program cannot use a quota system-it cannot "insulat[e] each category of applicants with certain desired qualifications from competition with all other applications." Instead, a university may consider race or ethnicity only as a " 'plus' in a particular applicant's file," without "insulat[ing] the individual from comparison with all other candidates for the available seats." In other words, an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not

necessarily according them the same weight."

*Id.* at 334, 123 S.Ct. 2325 (internal citations omitted). The Plaintiffs do not contend UT's admissions policy functions as a quota system and the record is insufficient at this stage in the litigation to establish a substantial likelihood that UT's admission's policy is not narrowly tailored under *Grutter.* UT has chosen to advance its interest in obtaining a diverse student body through "a holistic, multi-factor, individualized assessment of each applicant," of which race is one of many factors. Def's Opp. at 4. UT's admissions policy is very similar to, and allegedly modeled after, Michigan Law School's policy upheld in *Grutter,* 539 U.S. at 337, 123 S.Ct. 2325 ("[T]he Law School engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment."). UT's admissions policy is not identical to Michigan Law School's. The Top 10 Percent Law has a significant effect on admissions, with over eighty percent of students receiving admission pursuant to the statute. Pl's Mot. for Prelim. Inj. Ex. 17. Plaintiffs argue the Top 10 Percent Law has already achieved a "critical mass" of diversity and, therefore, any further use of race in admissions neither serves a compelling interest nor is narrowly tailored. Pl's Reply at 4. However, as discussed above, the record is insufficient to permit the Court to define "critical mass"· or to establish whether the Top 10 Percent Law has met or exceeded the "critical mass" necessary to achieve UT's compelling interest in obtaining a diverse student body. UT's decision to further improve diversity by considering race as a factor in admissions indicates UT has determined the Top 10 Percent Law provides an insufficiently diverse student body. Furthermore, the Supreme Court has recognized that "[n]arrow tailoring does not require exhaustion

of every conceivable race-neutral alternative." *Grutter,* 539 U.S. at 339, 123 S.Ct. 2325. The Court thus finds, based on the current record and Supreme Court precedent, that Plaintiffs have failed to establish a substantial likelihood UT's policy violates the Equal Protection Clause and failed to establish a substantial likelihood of success on the merits.

## II. Plaintiffs Failed to Establish a Substantial Threat of Irreparable Injury

Plaintiffs claim they will suffer two irreparable injuries if a preliminary injunction is not entered: (1) they will be forced to pay non-refundable fees to reserve their places at other universities and (2) they will be unable to attend UT beginning in the Fall 2008 semester. Pl's Mot. for Prelim. Inj. at 1, 22–23. A threat of monetary injury can be compensated by an award of money damages and therefore does not warrant preliminary injunctive relief. *See City of Meridian v. Algernon Blair, Inc.,* 721 F.2d 525, 529 (5th Cir. 1983). Depending on the circumstances, a delay in obtaining school admission can constitute irreparable injury. Delayed admission to a public grade school can cause irreparable injury. *See McLaughlin v. Boston Sch. Comm.,* 938 F.Supp. 1001, 1011 n. 13 (D.Mass.1996). Delayed admission to a university can cause irreparable injury when the person harmed has no comparable opportunities elsewhere. *See Faulkner v. Jones,* 10 F.3d 226, 233 (4th Cir.1993). However, several courts have held that delayed admission to a graduate school or program does not satisfy the irreparable injury requirement. *See Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1460 (7th Cir.1995) (delayed admission into medical residency program); *Martin v. Helstad,* 699 F.2d 387, 391–92 (7th Cir. 1983) (delay of admission into law school did not constitute irreparable injury where litigant had enrolled in another school).

The interests involved in attending a university differ more significantly from the interests involved in attending a grade school than from a post-graduate school or program. Many people never attend college or graduate school, whereas every child is required by law to attend grade school until a certain age. Colleges and graduate schools are selective, routinely rejecting more people than are accepted. Additionally, both Plaintiffs have pending offers to attend other universities. The Court thus finds the Plaintiffs have failed to establish a substantial threat of irreparable injury.

### III. Balance of Harms and the Public Interest

■ Plaintiffs argue the potential harm to them caused by UT's use of race in admissions outweighs any burden UT would suffer if the Court enters an injunction and therefore an injunction best serves the public interest. Pl's Mot. for Prelim. Inj. at 23–25. Plaintiffs encourage the Court to engage in "rough justice" and argue the admission of two more students in a class of thousands would be a minimal burden. Pl's Reply at 10. However, nothing would stop hundreds or thousands of similarly disappointed applicants from making the same claim and requesting the same relief, i.e. re-evaluation of their application, excluding race as any consideration, against all those previously admitted or rejected. Additionally, determining whether Plaintiffs would have been admitted but for UT's consideration of race cannot be made simply by comparing their AI/PAI scores to the scores received by admitted non-preferred minority students. Instead, UT would be forced to redo its complicated, individualized assessment of thousands of applicants, including minority, non-minority, admitted, and rejected students. As the Defendants explained:

Reconsidering an applicant for the 2008 entering class utilizing the current holistic approach but without race as a consideration would require a significant and time intensive effort on the part of the Office of Admissions. This is so because the impact of race/ethnicity/and cultural background is contextually individualized to each applicant. It is not a value or figure that can be removed, after the fact, from the admissions process to determine i[f] there is an alternative result ... There is no place from which race can be removed except at the very beginning of the admissions process.

Def's Opp. Ex. 3, Ishop Aff. ¶ 17. Even if UT simply recreated the AI/PAI matrix for undeclared Liberal Arts majors, it would still require UT to re-read and re-evaluate 10,296 files. *Id.* at ¶ 24. The Defendants estimate re-evaluating 10,296 files could cost as much as $70,000 and "would require 8.5 weeks of full-time commitment at the expense of any other administrative duties." *Id.* at ¶¶ 24–29. The University and the public have an interest in avoiding the administrative disruption and expenditure of public funds, as well as an interest in maintaining a diverse student body. The Court finds the potential harm to the Plaintiffs does not outweigh the burden on the Defendants, and an injunction would likely disserve the public interest. The Court thus finds the Plaintiffs have failed to establish the factors necessary for a preliminary injunction and DENIES their request.

### Conclusion

In accordance with the foregoing:

IT IS ORDERED that Plaintiffs Abigail Fisher and Rachel Michalewicz's Motion for Preliminary Injunction [# 29] is DENIED.